CHARLES WALTER KAY, Appellant, v. HELEN HOSTERMAN KAY, Respondent.

First Department, March 18, 1932.

*H. Eliot Kaplan* of counsel [*Jacob Burnstein* with him on the brief; *Louis Lovesky*, attorney], for the appellant.

*Sarah Stephenson*, for the respondent.

MERRELL, J.  This action was brought by the plaintiff husband against the defendant, his wife, for an absolute divorce because of misconduct and adultery committed by defendant with one Clarence E. Clanny.  The answer of the defendant denied the allegations of the complaint that she was guilty of adultery with Clanny on September 28, 1930, at 10 Columbia avenue, Palisade Park, in the State of New Jersey.  Upon the pleadings the following issue was framed: " Did the defendant commit adultery with one, Clare Clanny, at Palisade Park, New Jersey, on the 28th day of September, 1930? "  The said issue was tried at Trial Term before a justice of the Supreme Court and a jury.  The jury answered the framed question in the negative, and judgment was thereafter rendered dismissing the complaint upon the merits, with costs to the defendant.  From said judgment the plaintiff appeals upon two grounds: *First*, that the verdict of the jury was contrary to the evidence; and, *second*, that the case was submitted to the jury on an erroneous theory.  We are of the opinion that the verdict rendered by the jury, answering the framed question in the negative, was so clearly against the weight of the evidence as to require a reversal of the judgment dismissing the complaint, and that, upon the evidence, plaintiff was clearly entitled to a verdict and is now entitled to a decree dissolving the marriage between the plaintiff and the defendant because of the defendant's proven misconduct.  We are also of the opinion that the court erred in refusing to receive evidence offered by plaintiff at the trial, and in submitting the issues to the jury on an erroneous theory.

At the trial one Horace B. Norvill testified as a witness for plaintiff. Norvill was by occupation a linotype operator employed by the New York *Times*. Plaintiff was also in the service of the same employer in a like capacity. Norvill testified that on the night of September 27, 1930, at the request of plaintiff, he took up a position on a roof adjoining an apartment occupied by defendant at 10 Columbia avenue, Palisade Park, N. J., and that from his position he could look into a bedroom in the apartment occupied by defendant, and also into the kitchen and a portion of the foyer or hall of the apartment. A window shade of the bedroom was partly drawn, but there remained at the bottom about six inches through which Norvill testified he had a clear vision of the rooms mentioned. He testified that at about nine o'clock at night the defendant, accompanied by the corespondent, Clanny, entered the apartment; that the defendant first came into the bedroom and removed her dress and put on a house apron, Clanny at that time remaining in the kitchen; that both the defendant and Clanny then engaged in cleaning the kitchen and articles of clothing. The witness testified they were fumigating the rooms and that he smelled a strong odor of disinfectant; that the defendant and Clanny were packing to move, and were in the kitchen thus engaged about three hours and up until about fifteen minutes before one o'clock on the morning of September twenty-eighth; that then Clanny, who had placed a trunk on the bed in the bedroom for the purpose of packing, came in and removed the trunk, remarking to defendant: " What did I put this on here for? " to which defendant replied: " Because I told you to, I suppose." That thereupon Clanny laid down across the bed, and the defendant came in from the kitchen and they laid down across the bed together for a while, and then the defendant " took off the house apron and laid back down on the bed, the two of them together embracing and caressing " for a period of fifteen minutes; that the defendant at that time was clothed only in stepins and brassiere, nothing more; that they were in that position for some fifteen minutes embracing, Clanny, the corespondent, feeling over the defendant's body. Norvill testified that the defendant was quite aggressive; in fact, the more aggressive of the two, and in effect that he could see from his position that Clanny manifested lascivious inclinations; that after about fifteen minutes of that, the defendant got up and removed all of her clothing, and laid back down across the bed. Norvill testified that while the defendant and Clanny were caressing, lying across the bed, they conversed together, that he did not hear what the defendant said, but that Clanny said: " Well, if I thought you were anybody else's I would not be here," and, also, when the

defendant removed her underclothing, Clanny said: " What do you expect me to do — go home? " and that the answer was a smile. He testified that he was only about four feet away from the head of the bed upon which the defendant and the corespondent were reclining when he made his observations, and that the window was open. Norvill testified that at this juncture, in accordance with a prearranged plan which he had with plaintiff, he crawled to the edge of the roof and after two or three minutes, by means of a flashlight, gave plaintiff, who was stationed across the street with another, a signal, and that about three minutes after plaintiff crashed in the door of the apartment and entered the apartment and bedroom in company with a man by the name of Ballew. Norvill testified that the plaintiff then came to the window through which he had made his observations and pushed out the screen, and that Norvill then entered the apartment. Norvill testified that when he entered the apartment he saw the defendant in the hall outside of the bathroom and that the corespondent was still lying upon the bed; that when the witnesss saw the defendant in the hall outside the bathroom, she had a kimono slung across her shoulders, but was otherwise unclothed. Norvill's testimony at the trial was in nowise weakened by a long and searching cross-examination to which he was subjected by defendant's trial counsel.

Hulon L. Ballew testified as a witness in behalf of plaintiff. He was a poster printer and had only met plaintiff on the night of September twenty-seventh, but had known plaintiff's fellow-employee, Norvill, for several years; that he met plaintiff and Norvill on the evening of September twenty-seventh, and, when informed that they were about to investigate the conduct of the defendant, asked permission to accompany them. Ballew testified that when they received the signal from Norvill, plaintiff broke in the door and ascended to the defendant's apartment, he, Ballew, remaining somewhat behind, but finally went up and entered the apartment and then went to the bathroom door and pushed it open and there found the defendant attempting to adjust a robe over her shoulders; that, with the exception of the robe over her shoulders, she was unclothed.

The defendant was sworn as a witness in her own behalf, and testified that on September 27, 1930, she was employed as a waitress and cashier at a tea room on Engle street in Englewood, N. J. Defendant testified that on the night in question, between half-past eight and nine o'clock, she left her work and went to her apartment accompanied by the corespondent, Clanny. She testified that the apartment and their clothing were overrun by cockroaches

and bedbugs, and that they used an electric spray which Clanny had brought, spraying turpentine upon the garments and about the rooms, being occupied in such work at least three hours. Defendant testified that as the result of the spraying, the corespondent, Clanny, became very weak; that he had been gassed during the war and that anything in the nature of a gas of any sort affected his lungs; that Clanny went up to the bedroom and threw himself across the bed, and that she entered the room after that and rested herself on the bed on her elbow and leaned over and asked him how he felt, and then leaned down and spoke to him a few minutes about how he was feeling and if he would like some coffee, which she had already placed upon the stove. The defendant testified that she then got up and removed her dress and threw a light robe over her shoulders and took off the rest of her clothing, putting the robe completely around her in preparation for taking a bath; that she had lighted the water tank, and then entered the bathroom. Defendant testified that after she had entered the bathroom she heard a noise and realized that the plaintiff had entered the apartment. The defendant positively denied that on the night of September twenty-seventh or early morning of September twenty-eighth she had committed adultery with the corespondent, Clanny, and denied that she, at any time in her life, had committed adultery with anybody. Defendant testified that Clanny was a family friend and had previously been in partnership with plaintiff in the radio business. Defendant testified that while she was removing her underclothing Clanny was lying on the bed with his head away from her, facing the ceiling, with his feet on the floor toward her. Defendant denied embracing and caressing Clanny. She was asked by her trial counsel: " Did you put your arm around him? A. I put my arm just over him, and that was all. Q. You heard Mr. Norvill testify that after you got undressed you got onto the bed alongside of Mr. Clanny. Is that statement true? A. After I was undressed? Yes. A. No." Defendant claimed that her purpose in getting undressed was to take a bath. Defendant also denied the testimony of Norvill in which the witness testified that he overheard Clanny say: " If you were anybody else's I would not be here." The defendant denied that Clanny made any such statement, and also denied the testimony of Norvill that Clanny had stated, after the defendant had become naked and was lying on the bed; " What do you expect me to do — go home? " Defendant testified that Clanny was a man forty or forty-one years of age and that she was twenty-eight years old. Defendant's testimony and denials of improper relations with the corespondent were very much weakened by her cross-examination.

The testimony was that a Mrs. Diss was employed to look after the children of the parties in the absence of the defendant at her work, and that this Mrs. Diss was present when the defendant and the corespondent entered the apartment on the evening of September twenty-seventh, but left very shortly thereafter. The defendant testified: "She made an extreme effort to get out  *  *  * immediately." The defendant testified that Clanny had been accustomed to take her home two or three times a week, calling for her at her place of business, and that he had possibly done so four times a week, and that whenever Clanny took the defendant home Mrs. Diss was accustomed to leave soon after, Clanny remaining after the departure of Mrs. Diss.

Clanny, sworn as a witness for defendant, testified that for about a year prior to the trial he had been accustomed to take the defendant home nights in his car, a distance of three or four miles from where she was employed, and that he generally called for her on her late night; that she worked to twelve o'clock every other night, and that he generally called for the defendant then because she had to change cars at a junction, and that he had called for her every other night for about a year. Clanny also admitted that when he was accustomed to go into the apartment with the defendant Mrs. Diss "got out pretty pronto" and within two or three minutes after they had arrived at the apartment. The defendant also, on her cross-examination, admitted that when her husband and Ballew entered the apartment, she had nothing on but her kimono which she had around her. On cross-examination the defendant testified that after Clanny had gone into her bedroom and had thrown himself across the bed with his feet on the floor, she came in and asked him how he felt, and that she leaned over on her elbow, resting her elbow on the bed and lying sidewise. Defendant testified: "I put my hand on his forehead to see if he was running a temperature. It is very usual for him to run a heavy temperature, and I got up then and undressed; took off my dress, put my robe around my shoulders and took off the rest of my clothes. Q. And Mr. Clanny was lying on the bed while you undressed? A. Yes. Q. And what was he doing while you were undressing? A. Just lying there."

It appeared at the trial that the defendant had given testimony on a habeas corpus proceeding hearing which had taken place some time before and had testified at such hearing concerning the same transaction. On cross-examination at this trial, she was asked: "Q. Now, on this habeas corpus hearing, Mrs. Kay, do you remember being asked this question and making this answer on examination by your own attorney: 'Q. Did you embrace Mr. Clanny

while you were in bed? A. It is possible.' A. I remember. Q. You do remember? A. Yes." Later on in the cross-examination of defendant she was asked with reference to the testimony which she had given in the previous habeas corpus proceeding. She was asked at the trial the following questions: " Q. And do you remember being asked this question by your attorney and giving this answer: ' Q. Did you have your kimono or slip, or whatever it is that you — A. Yes, then I got my kimono on.' You remember that? A. Yes. Q. And do you remember being asked this question by the Court and giving this answer: ' By the Court: Did you kiss him while he was lying on the bed there? A. I think I did when I entered the room.' Do you remember that? A. Yes." The defendant at the trial could give no explanation why she found it necessary to undress in the bedroom in the presence of the corespondent instead of in the bathroom. The defendant was unable to state in the habeas corpus proceeding whether or not the corespondent was looking at her as she was removing her clothing in the same room.

We think the testimony of the witness Norvill was corroborated by the admissions of defendant as to her former testimony in the habeas corpus proceedings, that she had, in fact, kissed and embraced the corespondent as they were lying upon the bed. We have no hesitation in believing that the testimony of the defendant and her paramour, Clanny, as to what occurred was untruthful. There was proven a lascivious inclination on the part of the defendant and Clanny, and opportunity to gratify such inclination, and it may well be inferred that the actual act of sexual intercourse occurred. The verdict of the jury was clearly against the weight of the evidence. We are also of the opinion that the justice presiding at the trial erred in refusing to permit plaintiff to ask the defendant whether she loved plaintiff; whether she ever loved him; as to whether her husband had requested her to come back and live with him around Christmas, 1929, and as to whether the defendant thought the corespondent, Clanny, was a married man. Defendant's trial counsel, when these questions were asked of defendant, interposed objections thereto, which were sustained by the justice presiding at the trial, and to which rulings plaintiff duly excepted. We think these inquiries were entirely pertinent, and that the plaintiff should have been permitted to ask the questions. In *Black* v. *Black* (30 N. J. Eq. 288; quoted in *Graham* v. *Graham*, 50 id. 701) the court stated: " In cases of this class, where infidelity is charged against the wife, it is always important to inquire whether the evidence shows she has so far suffered herself to be alienated from her husband as to allow a criminal love or desire for another

man to enter her heart. If such a passion has found a dwelling there, proof which would otherwise be scarcely sufficient to raise a passing cloud of suspicion will possess a most convincing force."

Had plaintiff been permitted to ask the questions and the defendant compelled to answer them, the answers may well have disclosed a lascivious desire on the part of defendant. It has been held that an act of adultery disassociated with that embraced in the pleadings in an action may be proven for the same purpose. (*Roth* v. *Roth*, 90 App. Div. 87). In *Roth* v. *Roth* (*supra*) the court charged the jury as follows: " The burden is upon the plaintiff from first to last in the case. He must satisfy you by a fair preponderance of credible evidence of the two propositions which I have heretofore indicated to you; *first*, that these parties had the lascivious desire; and, *second*, that they had the opportunity to gratify it; and *third*, that they did gratify it. That, however, you may find as an inference."

In *Davidson* v. *Davidson* (134 App. Div. 958) it was held that where evidence indicated the guilt of the defendant, even though the intimacy stopped short of actual guilt, the mere fact that no one saw the act was not important, and the judgment for defendant was reversed. This court, under circumstances much weaker than those presented in the case at bar, very recently reversed an order and judgment granted at Special Term and reversed the findings of a jury on framed issues upon which they were based as against the weight of the evidence. (*Rathje* v. *Rathje*, 232 App. Div. 664.) An examination of the record on appeal in *Rathje* v. *Rathje* discloses that but a single act of adultery was embraced in the framed issue in that case. The defendant wife in that case and the corespondent were found together in a bedroom in the corespondent's apartment. There was no evidence of any actual adulterous act between them. The proofs in that case were much less incriminating than those in the case at bar. The jury found for the defendant, but, upon appeal, this court set aside the verdict and reversed the judgment in defendant's favor as against the weight of the evidence. The jury in the case at bar, upon the evidence submitted to it, should have answered the framed question in the affirmative.

We are also of the opinion that the trial court erred in denying the request of plaintiff's trial counsel to charge the jury that if the jury found that the parties charged with wrongdoing had the lascivious desire and that they had the opportunity to gratify it, whether or not they did gratify it may be found as an inference. This request the court declined to charge, and in so doing, in our

opinion, the court clearly committed error. The plaintiff was entitled to have the jury charged in the language of the request. (*Roth* v. *Roth*, 90 App. Div. 87; affd., 183 N. Y. 520.)

Upon the evidence plaintiff was clearly entitled to a decree of divorce. The judgment appealed from should be reversed and a new trial ordered.

FINCH, P. J., McAVOY and SHERMAN, JJ., concur; MARTIN, J., dissents.

Judgment reversed and a new trial ordered.